Martin G. Molina, Calif. Bar No. 176934
185 West "F" Street, Suite 100
San Diego, CA 92101
Telephone: (619) 232-0620
Facsimile: (619) 234-5322
mmolinaesq@outlook.com
CJA Attorney for Defendant
JORGE JOEL VINCES

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Janis L. Sammartino)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 20 CR 1761 JLS |
| ) | |
| Plaintiff, ) | Sentencing Memorandum |
| vs. ) | |
| ) | |
| JORGE JOEL VINCES, ) | Sent. Hrg. Date: January 28, 2022 |
| ) | Time: 9:00 a.m. |
| Defendant. ) | Courtroom: 4D |

The defendant, Jorge Joel Vinces ("Mr. Vinces"), by and through his CJA court-appointed counsel of record, Martin G. Molina, submits the instant sentencing memorandum in support of his request for a variance-sentence of 46 months in custody.

## I.

## **Factual Background**

Mr. Vinces is a 42-year-old husband and father of three children, living in Jaramijo, Ecuador.[1] PSR ¶ 70. He is the sole supporter of nine people living in his home, consisting of his wife, three children, his sister and her three children. PSR ¶¶ 72, 83. At the time of the offense, May of 2020, his source of income had essentially dried out as a result of the pandemic that had just started to take over the world. With no one

---

[1] Jaramijo is a coastal town in Ecuador.

1

20 CR 01761 JLS

to turn to, Mr. Vinces agreed to participate in the maritime transportation of cocaine for purportedly $40,000 with $5,000 paid upfront. PSR ¶ 38.

Mr. Vinces was born and raised in Ecuador. PSR ¶ 65. He was raised by his mother and an abusive stepfather in conditions of abject poverty. PSR ¶¶ 67, 68. He completed only a year and a half of schooling. Beginning at the age of 15 and for most of his life, he made a living as a fisherman. PSR ¶¶ 69, 84. In the year 2000, at the age of 21, Mr. Vinces married his wife, Monica Rocio Suarez with whom he ultimately had three children. As his family grew, so did his financial necessities. Ten years into the marriage, he switched careers to that of a taxi driver. PSR ¶ 83. During normal economic conditions, he earned between $30 and $40 dollars daily. On March 2020, with the outset of the pandemic, his income was reduced to about $30 a week. PSR ¶ 83.

Less than a week before the offense, two taxi customers told Mr. Vinces that they were looking to hire fishermen to transport merchandise by boat. Mr. Vinces expressed interest saying that he had over 15 years of prior experience as fisherman and was familiar with the operation of boats. As the conversation continued, he found from the men that the job was for smuggling drugs to a point off the coast of southern Mexico. They offered Mr. Vinces $5,000 upfront and $45,000 upon his return. PSR ¶ 37. At the time, Mr. Vinces was under intense financial pressure to feed his family and bury his recently deceased grandmother. PSR ¶ 38. He also owed $21,000 to the bank. PSR ¶¶ 18, 107. He accepted the offer and agreed to meet the recruiters the next day.

The following day, Mr. Vinces had some reservations about his agreement and contacted the men to call off the deal. PSR ¶ 38. But later that day, he changed his mind after incurring additional personal debts. Id. At the recruiters' request, he picked them up and drove them to his house because they wanted to personally see where he and his wife lived. There, they paid him $5,000 in cash. Mr. Vinces then drove them to the nearby town of Malta. On the way there, they told him that the following morning they would send someone to pick him up.

2

20 CR 01761 JLS

As promised, the following morning, a man drove to Mr. Vinces' home and picked him up. They drove six hours up the coast to Esmeraldas, Ecuador, close to the border with Colombia where he was met by a group of men including codefendant Tedith Perez-Acuna. PSR ¶ 20. They were then taken to a Colombian forest mangrove where the panga boat with the cocaine was stored. PSR ¶ 20

They were provided with two GPS tracking devices, two satellite phones, and one compass. The men instructed Mr. Vinces and Perez-Acuna to stop at a number of coordinates along the way for refueling. They would have to contact the refueling boats using the satellite phones. They also provided them with the coordinates of the location where they would meet with the panga boat from Mexico to transfer the cocaine, which was hidden under the deck of the boat. Mr. Vinces and Perez-Acuna would then continue on board the Mexican panga boat to Guerrero, Mexico and from there, they would be flown back to Ecuador. The men warned them not to lose the load and threatened them with violence against their loved ones. PSR ¶ 39.

For the next five days, Mr. Vinces and Perez-Acuna navigated the waters of the Pacific Ocean in a northerly direction, stopping at the predesignated fueling coordinates. On May 28, they arrived to the location designated to meet with the Mexican panga. While they waited, they were spotted by the crew of the U.S. Coast Guard Cutter Stratton, which was patrolling the international waters. Ultimately, the Mexican panga boat operated by codefendant Saturno-Paz and occupied by codefendants Gallardo and Pineda met up with Mr. Vinces' boat. As per the instructions of the recruiters, Mr. Vinces and the rest of the men pried open the deck of the boat, retrieved the packages of cocaine and transferred them to the Mexican panga boat. While this was taking place, the Stratton sent two boats with USCG personnel towards the two panga boats. When the men saw the approaching boats, they jumped on the Mexican boat and took off under the helm of Saturno-Paz. While the pursuit was taking place, the occupants threw

3

20 CR 01761 JLS

overboard the packages of cocaine.[2] As described in the presentence report, the pursuit concluded after the engines of the panga boat were successfully disabled by the USCG.

After the arrest and seizure of the cocaine, Mr. Vinces and the rest of the codefendants were transported to the Stratton and placed in a holding area where other people were also held in connection with unrelated maritime seizures. For the next 24 days, Mr. Vinces was held in the Stratton, which instead of immediately traveling back to San Diego, continued patrolling the ocean. Mr. Vinces recalls that several times, the Stratton would meet up with another vessel and transfer detainees from the Stratton, but not Mr. Vinces nor the other codefendants, who were kept shackled in close quarters.

On June 27, 2020, the Stratton arrived to San Diego. Upon their arrival, Mr. Vinces and the codefendants were turned over to Customs and Border Protection. Later that day, Mr. Vinces was interviewed by agents from Homeland Security Investigations. Mr. Vinces waived his rights, truthfully answered the questions by the agents and confessed his involvement in the transportation of the cocaine. PSR ¶¶ 18-23.

Mr. Vinces is remorseful for the offense. PSR ¶ 40. Since his arrest, he has learned that his recruiters went looking for him and kidnapped his brother. PSR ¶ 41. Apparently, they suspected that Mr. Vinces and Perez-Acuna had stolen the load of cocaine. Ultimately, they released him after his family proved to their satisfaction that Mr. Vinces was in custody. Mr. Vinces plans to move his family out of Jaramijo once he returns after the completion of his sentence. PSR ¶ 41.

## II.

## The United States Sentencing Guidelines Range

**The Plea Agreement**

The plea agreement contains the following agreed-upon calculations: A base offense level of 38 pursuant to USSG § 2D1.1(c)(1), a two-level adjustment for reckless

---

[2] The Coast Guard recovered 179 packages of cocaine with a combined weight of 703.9 kilograms. PSR ¶¶ 6, 9.

4

endangerment during flight pursuant to § 3C1.2,[3] a two-level adjustment for safety valve (if applicable),[4] and a combined adjustment of three levels for acceptance of responsibility. The government will recommend a variance-sentence of 96 months at the time of sentencing.

The plea agreement allows Mr. Vinces to request other adjustments, departures and variances. However, he is specifically precluded from requesting a variance based on the conditions of detention and the length of detention (29 days) in the *Stratton* before being presented to a magistrate judge for his initial appearance.[5]

**The Presentence Report**

The presentence report differs from the plea agreement in two respects.

First, it recommends against the +2 adjustment for reckless endangerment during flight on the grounds that Mr. Vinces did not operate the panga while it was being pursued by the Coast Guard ("it is determined that Vinces was not operating the vessel as they were fleeing from USCG, and he did not willfully cause the flight from law enforcement.") PSR ¶ 46.

And second, it recommends the imposition of a two-level adjustment under § 2D1.1(b)(3)(C) for sharing the piloting duties of the panga boat. Mr. Vinces disagrees with this recommendation because the adjustment applies in cases of importation or

---

[3] During plea negotiations, the undersigned counsel unsuccessfully requested the government not to impose this adjustment on Mr. Vinces because he did not pilot the panga during the chase. Notably, the presentence report does not recommend this adjustment. PSR ¶ 46.

[4] The government is recommending a two-level adjustment for safety valve. See government chart filed as ECF 99.

[5] On July 17, 2020, Mr. Vinces filed a motion to dismiss the indictment because of undue delay in presentment. ECF 31.

5

20 CR 01761 JLS

exportation. Mr. Vinces, however, pled guilty to possession of cocaine with intent to distribute aboard a vessel.

**Mr. Vinces' Recommendations**

    **Base Offense Level: 34**. The offense involved 703.9 kilograms of cocaine. As such, the initial base offense level is **38** [USSG § 2D1.1(c)(1)]. With a minor role adjustment (see argument below), the base offense level is recalculated at **34** pursuant to § 2D1.1(a)(5).

    **Safety Valve: -2** [USSG § 2D1.1(b)(18)]

    **Minor Role: -2** [USSG § 3B1.2(b)] For the reasons stated in the arguments below, an adjustment for minor role is appropriate in this case.

    **Reckless Endangerment During Flight: +2** [USSG § 3C1.2]

    **Acceptance of Responsibility: -2, -1** [USSG § 3E1.1(a),(b)]

    **Adjusted Offense Level: 29**

    **Criminal History Score: 0 PSR ¶ 58**

    **Criminal History Category: I PSR ¶ 59**

    **Guideline Range: 87 to 108 months**

    **Requested Variance-Sentence: 46 months**

    **Minor Role--**

USSG § 3B1.2 provides for a downward adjustment if the defendant was a "minor participant" in any criminal activity. A minor participant is someone that is "substantially less culpable than the average participant in the criminal activity." See Application Note 3(A). Put another way, a minor participant is someone "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." See Application Note 5. To determine whether a defendant is a minor or minimal participant, the Court should consider the factors listed in Application Note 3(C). The application notes specifically identify drug couriers as an

example of a minor participant. See Application Note 3(A) ("For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under § 1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline.").

Next, the guideline provides a "non-exhaustive list of factors" to consider for a minor or minimal role adjustment. USSG § 3B1.2, App. N. 3(C). The factors are:

1. The degree to which the defendant understood the scope and structure of the criminal activity;
2. The degree to which the defendant participated in planning or organizing the criminal activity;
3. The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
4. The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
5. The degree to which the defendant stood to benefit from the criminal activity.

*Id*. Every single factor shows that Mr. Vinces' limited involvement is exactly what the guideline means by "minor" or "minimal" participant. Mr. Vinces had very little understanding of the scope and structure of the criminal activity. He knew that he was navigating a loaded vessel across the waters and that the vessel contained cocaine hidden under the deck. He knew the plan was to refuel at certain points determined by the coordinates and to meet up with a Mexican panga boat to transfer the drugs. That is the extent of his knowledge. He was not even told the amount of drugs that he was involved with, nor did he know what organization had hired him. His lack of knowledge is particularly important in this analysis given the instruction in Application Note 4 that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a *minimal* participant."

7
20 CR 01761 JLS

USSG § 3B1.2 App. N. 4 (emphasis added).

As to the second factor, Mr. Vinces did not have *any* involvement in the planning or organizing of the offense, but he was acting entirely under the instruction of another person. Similarly, under factor three, he had no decision-making authority or influence because, again, he was acting entirely under the specific instruction of another person.

As to factor four, Mr. Vinces' participation was no doubt important as he had to operate the vessel to a certain location off the coast of Mexico in order for the next phase of the operation to start. But, he had absolutely *no* discretion in how to perform that act. And, the guidelines explain "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." USSG § 3B1.2, App. N. 3(C).

As to the final factor—the extent to which the defendant stood to benefit— Mr. Vinces was told he would be paid $45,000. However, he was provided with $5,000 beforehand with no assurance that he would be paid the balance upon his return. Thus, given the circumstances, it was uncertain at best if Mr. Vinces would benefit from the operation. Moreover, even if he was paid, it would have been a small fraction compared to the value of 703 kilograms of cocaine. Thus, in short, the instructions in the mitigated role guideline support a minor role adjustment for a recruited courier like Mr. Vinces.

### III.

### The 18 U.S.C. 3553(a) Factors Support a Variance-Sentence of 46 months

18 U.S.C. § 3553(a) sets forth the factors the Court must consider when imposing a sentence upon a defendant. This Court may not "presume that a sentence within the applicable Guidelines range is reasonable."[6] The sentence imposed must be sufficient, but not greater than necessary to achieve the goals of sentencing.[7] The Court should "consider every convicted person as an individual and every case as a unique study in

---

[6] *Nelson v. United States*, 129 S. Ct. 890, 892 (2009).

[7] 18 U.S.C. § 3553.

8

20 CR 01761 JLS

human failing that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[8]

Mr. Vinces requests a variance for a number of reasons. His history and characteristics are mitigating. He is the father of three children and the sole supporter of a household of nine people. He has a positive work history, began at the age of 15 when he became a fisherman and for the next 14 years in the coastal town of Jaramijo, Ecuador. In 2010, he ventured into a new line of work as a taxi driver, seeking a higher source of income to raise his family. Unfortunately, with the advent of the pandemic on May of 2020, his business was severely affected to the extent that his daily income became his weekly income. He was recruited by two Colombian men while he transported them in his taxi cab upon learning that he was an experienced fisherman. These men were savvy. Mr. Vinces was heavily indebted and they literally flashed $5,000 in cash in front of him. Although they promised him an additional payment of $45,000 there was no certainty of such payment. But Mr. Vinces was desperate and went ahead with the offer.

Mr. Vinces resolved his case without trial or litigating his motions, thereby saving the Court and the Government significant time and resources involved with litigation and trial preparation. In these motions, Mr. Vinces sought a dismissal of the indictment because of the undue delay in presenting him and also on the grounds of lack of jurisdiction for not complying with the requirements of the Maritime Drug Law Enforcement Act. He also filed a motion to suppress his post-arrest statements and a motion to compel specific discovery. He could have also made claims regarding destruction of evidence as the panga boat was sunk by the U.S. Coast Guard.

Rather than contest his case, however, Mr. Vinces declined to raise these legitimate issues. In doing so, he saved the Government and the Court a significant

---

[8] *Gall v. United States*, 128 S. Ct 568, 598 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

9

20 CR 01761 JLS

amount of time and resources. Furthermore, as part of his plea, he waived all of rights to appeal his conviction or sentence, thereby ensuring finality for the Government. Mr. Vinces, however, is not receiving any fast-track points (not -4, nor -2) for his efforts and decision to resolve the case without litigation and trial. The requested variance sentence of 46 months is justified in part by these circumstances reflecting his expeditious resolution and waiver of appeal.

The variance is also justified because assuming that the +2 adjustment for reckless endangerment applies, it overstates Mr. Vinces' culpability because he did not operate the panga boat during the pursuit.

The variance is also justified to make up for Mr. Vinces' difficult conditions of confinement. Since the outset of the COVID-19 pandemic and the ensuing judicial emergency orders, defendants in this district have been routinely afforded two- to four-level variances from the Guidelines. This variance has been applied due to the risks, difficulties and restrictions inmates experience during the global pandemic. The variance has also been provided because of the extended delays and continuances of court hearings, and the lack of in-person court proceedings due to quarantine and social distancing measures taken by the courts. Mr. Vinces, like other inmates during the pandemic, has experienced exposure to COVID-19, countless quarantines, and several postponed and continued court hearings, for the past 19 months.

These restrictions certainly add a layer of discomfort which enhances the punishing effect of each day spent in custody. The requested variance sentence will simply offset these extraordinary hardships not contemplated by the sentencing guidelines. Because Mr. Vinces has been impacted by the COVID-19 pandemic just as much as others receiving two or four-level variances, a variance sentence is appropriate.

The requested variance sentence will not compromise the need for general deterrence - 46 months at a federal prison is a remarkable period of incarceration that should deter anyone from violating the drug laws. This sentence will also satisfy the

10

20 CR 01761 JLS

need for individual deterrence because Mr. Vinces has never been in prison before. It is uncontroverted that prison carries a greater significance and impact for those individuals imprisoned for the first time. *See*, *e.g.*, *United States v. Baker*, 445 F.3d 987, 990, 992 (7th Cir. 2006) (affirming nonguideline sentence that was justified, in part, by the fact that prison would "have a greater impact" on someone with no "previous experience being incarcerated"); *United States v. Qualls*, 373 F. Supp.2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend."). Researchers consistently find that it is the *certainty* of punishment that affects deterrence rates, rather than the *severity* of the punishment. *See e.g.,* Valerie Wright, Ph.D, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, November 2010.[9]

The safety of the general public will not be compromised because after the completion of his sentence, Mr. Vinces will be deported to Ecuador. He has no ties to the United States which could incentivize him to return. In fact, the crime did not have as an object entering the territorial waters of the United States.

Lastly, the variance-sentence of 46 months will also provide *just punishment* for this is a significant loss of liberty. While in prison, Mr. Vinces will not be able to get visits from his wife or children because they live in Ecuador, are poor, and do not have the ability to obtain a visa. Thus, his prison term will be harsher than it is for the typical inmate.

///

///

---

[9] Available at https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/.

## IV.
## Conclusion

For the foregoing reasons, Mr. Vinces requests a sentence of 46 months in prison. This sentence will be reasonable and not greater than necessary in light of his personal history and characteristics, the nature and circumstances of the offense, and the need to reflect the seriousness of the offense, afford adequate deterrence, and provide just punishment while protecting the general public.

Dated: January 21, 2022

Respectfully submitted,
LAW OFFICE OF MARTIN G. MOLINA

By: /s/ Martin G. Molina
Martin G. Molina
CJA Attorney for Defendant
JORGE JOEL VINCES